UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
RACHAEL CACERES,

                              Plaintiff,                    15-cv-4056 (PKC)

              -against-                                     MEMORANDUM
                                                            AND ORDER

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

                Plaintiff Rachel Caceres seeks judicial review of a final decision by the

Commissioner of Social Security (the "Commissioner") denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. § 1381 *et seq.* Plaintiff asserts that the decision of the Administrative Law Judge

("ALJ") "was erroneous, not supported by substantial evidence on the record, and/or contrary to

law." (Compl.¶ 9)  Plaintiff and defendant have each moved for judgment on the pleadings

under Rule 12(c) of the Federal Rules of Civil Procedure.  For reasons set below, the defendant's

motion is granted and the plaintiff's motion is denied.

I.       PROCEDURAL HISTORY

                The Complaint alleges that plaintiff is entitled to SSI benefits because she suffers

from asthma, obesity and mood disorder. (Compl. ¶4.)  It alleges that she has suffered from this

disability since January 1, 2005.  (*Id.* ¶ 5.)

Plaintiff applied for Supplemental Security Income ("SSI") on December 30, 2011. (R. 73, 194.)  On February 16, 2012, the Social Security Administration ("SSA") determined that plaintiff's alleged disability was not severe enough to prevent her from working and denied her application.  (R. 131-34.)  The SSA notified plaintiff that her claim was disapproved and informed of her right to request a hearing.  (*Id.*)  Plaintiff requested a hearing before an ALJ and a hearing was held before ALJ Paul A. Heyman on February 7, 2013 (R. 95.) Plaintiff was represented by an attorney. (*Id.*)

On February 21, 2014, ALJ Heyman issued a 12-page decision denying plaintiff's claim on the ground that she was not been disabled within the meaning of section 1614(a)(3)(A) of the Social Security Act.  (R. 73-85.)  Applying the Agency's sequential five-step test, the ALJ first found that plaintiff had not engaged in substantial gainful activity since the application date. (R. 76-77)  At the second step, the ALJ found that plaintiff had asthma, obesity and mood disorder, which were severe impairments under 20 C.F.R 416.920(c).  (*Id.*)  At step three, however, the ALJ determined that none of plaintiff's severe impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 and 20 C.F.R. § 416.920(d), 416.925 and 416.926.   Proceeding to step four, the ALJ concluded that plaintiff had the residual functioning capacity to perform less than the full range of medium work as defined in 20 C.F.R. § 416.967(c).  Lastly, the ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform."  (R. 84.)

Plaintiff sought review of the ALJ's decision.  (R. 252.) The Appeals Council denied plaintiff's appeal in a letter dated March 25, 2015, and the ALJ 's decision became the final decision of the Commissioner.  (R. 1.)

Plaintiff, again represented by counsel, filed a timely action with this Court seeking review of the Commissioner's final decision. Plaintiff and defendant have each moved for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P.

## II.    EVIDENCE BEFORE THE ALJ

### A.  *Non-Medical Evidence*

#### 1.  *Plaintiff's Testimony*

Plaintiff was born on February 29, 1992.  (R. 208.)  Plaintiff testified that she lives in a studio apartment in the Bronx, NY with her son who has autism.  (R. 102, 109.) A home attendant helps with the care of her son.  (R. 102.)  Plaintiff moved to Bronx, NY approximately two years prior to the date of her SSI hearing, after encountering domestic violence from the father of her child.  (R. 105.) She is able to read and understand English and testified to attending school until the age of eleven in Puerto Rico.  (R. 125, 211.)  She testified that she obtained her GED in four months-time with the assistance of her sister.  (R. 125-26.) Plaintiff also reported that she never worked.  (R. 212.)

Plaintiff testified that her biological father raped her continually while she was visiting him in the Dominical Republic for three months at the age of eleven.  (R. 100-01.) She was adopted by a family in Puerto Rico.  (R. 106.)  Beginning in 2005, she received psychiatric treatment in Puerto Rico, but could not remember the specifics of her treatment due to problems with her memory.  (R. 217)  Plaintiff testified that she likes to be alone, cries all the time, and has

difficulties with her memory, concentration abilities and sleeping due to her past.  (R. 100, 118-19.)

Plaintiff testified that she rarely leaves her apartment.  (R. 113.)  A home attendant takes her son to the park, does the shopping for the house, cooks, prepares breakfast for plaintiff's son and takes him to the bus in the morning, then prepares afternoon snacks for plaintiff and her son.  (R. 102-03.)  She reported that one a regular day, she picks her son from the bus in the afternoon, feeds him the food that the home attendant prepared, gives him a bath and puts him to sleep.  (R. 103.)  Plaintiff testified to staying at home and crying all day.  (R. 104.)  She also stated that she has very little contact with her adopted family.  (R. 105.)

Plaintiff made certain statements, approximately two years before the hearing that painted a different picture of her life activities.  On January 16, 2012, plaintiff completed a New York State Office of Temporary and Disability Assistance Function Report (R. 219-28.)  In that Report, she indicated that her daily activities included waking up early to feed her son breakfast, assisting his sessions with the home attendant, cleaning, doing laundry, preparing meals for her son, going out once a week, shopping for food and clothing once a month, and watching T.V. (*Id.*)  In a February 18, 2015 Function Report for the Social Security Administration, plaintiff, with the assistance of a non-attorney representative, reported preparing daily meals, such as "rice and beans, fried chicken, vegetables and [pasta]," going outside a few times a week, and shopping for food and toiletries once a month.  (R. 259.)  She also claimed the ability to follow written and spoken instructions, although she gets overwhelmed easily. (R. 262-63.)

B. *Medical Evidence*

In addition to the testimony given at the hearing, the ALJ reviewed plaintiff's medical reports from CCN General Medicine PLLC and Boston Road Medical Center.  (R. 73–85, 356–387)  He reviewed numerous progress notes from Cecilia Calderon, M.D., plaintiff's treating physician,. Lorena Grullon-Figueroa, M.D., plaintiff's treating psychiatrist, Dimitri Bougakov, Ph. D., a non-treating consultative psychologist, and V. Reddy, a state agency psychologist.

1. *Treating Physician's Records*

Dr. Calderon, an internist at CCN General Medicine, was plaintiff's primary care physician between September 14, 2010 and January 14, 2013.  (R. 265, 290–296, 303–311, 320–353.)

On February 16, 2011, Dr. Calderon administered a depression screening for plaintiff. (R. 321.)   Plaintiff denied having "little interest or pleasure in doing things" or feeling "down depressed or hopeless."  (*Id.*)  Following the depression screening, the record includes only three visits with Dr. Calderon where plaintiff complained of her psychological conditions.

Plaintiff saw Dr. Calderon on October 19, 2011 for pelvic inflammatory disease and to obtain refills on her psychiatric medication.  (R. 327.)  During that visit, Dr. Calderon diagnosed plaintiff with bipolar disorder, not otherwise specified ("NOS"), and provided refills for Seroquel and Zoloft.  (*Id.*)  In addition, she referred plaintiff to a psychiatrist.  In her progress note from that visit, Dr. Calderon noted that plaintiff had "general good state of health… no weakness, no fatigue… [and ability] to do usual activities."  (*Id.*)  Dr. Calderon also described plaintiff as "well-appearing, well-developed, [and exhibiting] no acute distress."  (*Id.*)

Completing a New York State Office of Temporary and Disability Assistance Division of Disability Determinations questionnaire on January 10, 2012, Dr. Calderon stated that plaintiff was receiving treatment for bronchial asthma and asthma. She indicated in the same report that plaintiff's mental status was normal for: (1) attitude, appearance, behavior; (2) speech, thought, perception; (3) mood and affect; and (4) insight and judgment. (R. 293.) Dr. Calderon indicated that plaintiff had good memory, and that her "information" functions and ability to perform calculations were normal. (*Id.*) Plaintiff received an assessment other than "normal" only for her attention and concentration abilities an characterized plaintiff as "aox3," meaning that she was alert and oriented as to person, time and place. (*Id.*) Further, Dr. Calderon noted that plaintiff had no limitations with understanding and memory, sustained concentration and persistence, social interactions, or adaption. (R. 295.) Dr. Calderon also indicated that she could not provide a medical opinion regarding plaintiff's ability to do work-related activities. (R. 296)

Plaintiff saw Dr. Calderon on March 12, 2012 for a sore throat, rectal bleeding, and to obtain refills of her psychiatric medications. (R. 331–33) During the same visit, plaintiff responded to a second depression screening, stating that in the previous two weeks she had not been "bothered by little interest of pleasure in doing things," and that she had not been "feeling down depressed or hopeless." (*Id.*) Dr. Calderon noted the diagnosis of bipolar disorder NOS and prescribed refills for Seroquel and Zoloft. (*Id.*) Dr. Calderon also noted that plaintiff had "general good state of health… no weakness, no fatigue," and was "able to do usual activities." (R. 332)

Plaintiff saw Dr. Calderon seven more times after her March 12, 2012 visit. According to the record, plaintiff did not express any psychological complaints during these

visits.[1]  (R. 265–355.)  Dr. Calderon's progress notes from these visits indicate that plaintiff had

a past medical history of bipolar disorder and asthma.  (*Id.*)   Additionally, they indicate that Dr.

Calderon continued to prescribe Seroquel and Zoloft.  (*Id.*)  However, they do not show that

plaintiff exhibited any psychiatric symptoms.  (*Id.*)  On the contrary, almost all of these visits

include notes from Dr. Calderon, indicating that plaintiff had "good general state of health, no

weakness, no fatigue, good exercise tolerance," and that plaintiff was "able to do usual

activities."  (R. 323–27, 332, 335, 339.)


   2.   *Treating Psychiatrist's Reports*

           Dr. Grullon-Figueroa, a psychiatrist, treated plaintiff between January 2013 and

December 2013.  (R. 297-300, 355–82.)  Dr. Grullon-Figueroa noted in the progress report from

her initial examination on January 8, 2013 that plaintiff's "mental status has no gross

abnormalities. Mood is euthymic, with no signs of depression or manic process. Her speech is

normal in rate, volume and articulation and her language skills are intact. . . . Associations are

intact, thinking is generally logical and thought content is appropriate. Her cognitive functioning,

based on vocabulary and fund of knowledge, is intact and age appropriate, and she is fully

oriented. There are no signs of anxiety. There are no signs of attentional or hyperactive

difficulties. Insight and judgment appear intact."  (R. 381.)

           During this visit, Dr. Grullon-Figueroa also noted that plaintiff did not exhibit any

suicidal impulses.  (*Id.*)  Further, Dr. Grullon-Figueroa diagnosed plaintiff with bipolar 2

disorder and anxiety disorder NOS (*Id.*)  She prescribed Seroquel and increased the dosage of

---

[1] Plaintiff saw Dr. Calderon, her primary care physician, for unrelated non-severe physical ailments on 04/15/2011, 05/25/2011, 03/21/2012, 04/27/2012, 05/21/2012, 07/10/2012, 07/30/2012, 09/27/2012, 10/04/2012 and 10/18/2012, comprising ten of out of thirteen visits plaintiff made to Dr. Calderon. (R. 265-355.)

plaintiff's Zoloft prescription.  (*Id.*)  Plaintiff's prescriptions to Topomax (mood stabilization

medicine) and Ambien (insomnia medication) were discontinued.  (*Id.*)

On January 15, 2013, plaintiff's second visit, Dr. Grullon-Figueroa completed a

Medical Source Statement of Ability to Do Work-Related Activities.  (R. 298.)  By checking the

appropriate boxes, Dr. Grullon-Figueroa indicted that plaintiff's ability to understand, remember

and carry out instructions was affected by her impairment.  (*Id.*)  Dr. Grullon-Figueroa indicated

that plaintiff had "mild" restrictions in: (1) understanding and remembering simple instructions;

and (2) carrying out simple instructions.  (*Id.*)  Further, she indicated that plaintiff had "marked"

restrictions in her ability to: (1) make judgments on simple and complex work-related decisions;

(2) understanding and remembering complex instructions; and (3) carrying out complex

instructions.  (*Id.*)  Dr. Grullon-Figueroa also noted that plaintiff's "difficulty concentrating

[was] causing memory problems."  (*Id.*)  Further, Dr. Grullon-Figueroa indicated, by checking

appropriate boxes on the form, that plaintiff had "marked" limitations in her ability to interact

appropriately with the public, supervisors, co-workers, and in her ability to respond appropriately

to usual work situations and changes in a routine work setting.  (R. 299.)  Dr. Grullon-Figueroa

indicated that limitations were due to her "concentration difficulty associated with depression,"

"[d]ifficulty relating to others," "irritability, decreased sociability, [and] increased worrying."

(*Id.*)  Dr. Grullon-Figueroa also stated that plaintiff had sleep disturbance and was unable to

control her worrying, which in returned interfered with her level of functioning. (*Id.*)

Dr. Grullon-Figueroa next saw plaintiff the day after she completed the Medical

Source Statement, on January 16, 2013.  (R. 379.)  During this visit, plaintiff reported no side

effects from medication, and explained that her symptoms were stable.  (*Id.*)  Dr. Grullon-

Figueroa stated that plaintiff displayed anxiety symptoms that were described as "less frequent or

less intense." (*Id.*)  Plaintiff had no depressive symptoms. (*Id.*) Dr. Grullon-Figueroa again found no apparent or serious mental status abnormalities.  (*Id.*)  She also stated that plaintiff's "memory is intact for recent and remote events, and [plaintiff] is oriented to time, place and person, [and] there are no apparent signs of anxiety." (*Id.*)  As protective factors, Dr. Grullon-Figueroa noted that plaintiff had good family support, and continued plaintiff's medication.  (R. 380)

Dr. Grullon-Figueroa next saw plaintiff on February 2, 2013.  (R. 377.)  During that visit, plaintiff reported doing fairly well with current management, but asked Dr. Grullon-Figueroa to increase her Seroquel because she was not sleeping well due to her son's "hyperactive and oppositional behavior." (*Id.*)  Plaintiff's mental status was identical to reports from January 8 and January 16, 2013, where Dr. Grullon-Figueroa found no apparent or serious mental abnormalities.  (R. 378.)  The doctor again noted good family support as a protective factor, and increased plaintiff's Seroquel dosage as requested.  (R. 378.)

When seen on March 4, 2013, plaintiff reported that her mother had come from Puerto Rico to help her for a few months with her son.  (R. 375.)  Dr. Grullon-Figueroa noted that plaintiff's manic and anxiety symptoms had lessened and that she exhibited no depressive symptoms.  (*Id.*)  Plaintiff's mental status was identical to reports from January 8, January 16, and February 2, 2013, when Dr. Grullon-Figueroa found no apparent or serious mental abnormalities.  (*Id.*)  In addition to "good family support," Dr. Grullon-Figueroa also listed "feeling of responsibility to children, family or other loved ones" and "religious beliefs" as further protective factors.  (R. 376.)  Dr. Grullon-Figueroa made no changes to plaintiff's medication.  (*Id.*)

On April 3, 2013, Dr. Grullon-Figueroa reported that plaintiff's mood symptoms and anxiety were in fair control with her medication.  (R. 373.)  The doctor reported that plaintiff described no side effects from her medication, and none were in evidence.  (*Id.*)  Dr. Grullon-Figueroa indicated that plaintiff's anxiety symptoms continued, although they were descried as "less frequent of less intense."  (*Id.*)  Plaintiff's mental status was identical to reports from January 8 , January 16, February 2, and March 4, 2013, where Dr. Grullon-Figueroa found no apparent or serious mental abnormalities.  (*Id.*)  Plaintiff's medication was continued without alterations.  (R. 374)

When seen on May 6, 2013, plaintiff reported that "she ha[d] been sleeping better and that her mood [had been] more stable."  (R. 371.)  She reported that her anxiety symptoms had improved due to her son's better behavior, and denied experiencing symptoms of anxiety and depression.  (*Id.*)  Plaintiff's mental status was identical to reports from January 8 , January 16, and February 2, March 4, and April 3, 2013, where Dr. Grullon-Figueroa found no apparent or serious mental abnormalities.  (*Id.*)  Plaintiff's medication was continued without alterations. (R. 372)

Plaintiff visited Dr. Grullon-Figueroa next on June 11, 2013. (R. 365-70.)  She reported having developed Bell's palsy on the left side of her face, and feeling "very anxious about it."  (R. 368.)  Plaintiff said she would like to consider medication for anxiety.  (*Id.*)  Dr. Grullon-Figueroa indicated that anxiety symptoms were present and occurring daily.  (*Id.*)  Plaintiff said she was experiencing difficulties in concentrating and sleeping due to anxiety, as well as "feelings of embarrassment and self-consciousness in social situations."  (*Id.*)  Plaintiff's mental status report from this visit was similar to that of her previous visits, except Dr. Grullon-Figueroa indicated signs of anxiety.  (*Id.*)  Plaintiff was otherwise described as "calm, attentive,

fully communicative, well groomed." (*Id.*)  Dr. Grullon-Figueroa reported that plaintiff's "speech [was] at normal rate [and] volume." (*Id.*)  Her mood was "normal with no signs of either depression or mood elevation." (*Id.*)  Dr. Grullon-Figueroa reported that plaintiff did not exhibit any "bizarre behaviors, or other indicators of psychotic process." (*Id.*)  Plaintiff's "associations [were] intact, thinking [was] logical, and thought content appear[ed] appropriate." (*Id.*)  Dr. Grullon-Figueroa prescribed Hydroxyzine for anxiety, decreased plaintiff's dosage for Seroquel due to insomnia, and continued Zoloft.  (R. 369.)

During her next appointment on June 27, 2013, plaintiff indicated that she was expecting a baby and desired to keep her pregnancy.  (R. 362-64.)  Dr. Grullon-Figueroa advised plaintiff to cease taking her medications immediately.  (R. 362.)  Plaintiff's mental status was identical to reports from January 8, 2013, January 16, 2013, February 2, 2013, March 4, 2013, April 3, 2013 and May 6, 2013.  (*Id.*)  However, Dr. Grullon-Figueroa reported that plaintiff "expressed many feelings of anxiety" during the session.  (R. 363)  Plaintiff's medication was discontinued due to her pregnancy.  (*Id.*)

On her last appointment with Dr. Grullon-Figueroa on September 5, 2013, plaintiff was three months pregnant.  (R. 360.) Plaintiff reported that "her mood and anxiety symptoms [were] fairly stable." (*Id.*)  She denied experiencing anxiety or depressive and manic symptoms.  (*Id.*)  Her mental status report from this visit, like almost all of Dr. Grullon-Figueroa's progress reports, revealed "no apparent serious mental status abnormalities." (*Id.*)  During the visit, plaintiff did not display any signs of anxiety, cognitive difficulties, or hyperactivity.  (*Id.*)  Her "insight and judgment appear[ed] intact." (*Id.*)  Dr. Grullon-Figueroa noted "severe anxiety or panic" were current risk factors and "good family support" was a protective factor in plaintiff's case.  (R. 361.)  Plaintiff was referred to BLHC for therapy.  (*Id.*)

A note dated December 5, 2013 from Dr. Grullon-Figueroa states that plaintiff was diagnosed with bipolar 2 disorder, anxiety disorder NOS, asthma and had a GAF (Global Assessment of Functioning) score of 55 (moderate symptoms).  (R. 387.)  This was Dr. Grullon-Figueroa's last and final report included in the medical evidence.

3.  *Non-Treating Physicians' Reports*

Four non-treating physicians evaluated plaintiff's medical condition: Dr. Bougakov, a psychologist affiliated with Industrial Medicine Associates, V. Reddy, a state agency psychologist, Bebsy Estafan, M.D. from Boston Road Medical Center, and Angela Diaz, M.D. of CCN General Medicine PPL.

Plaintiff saw Dr. Bougakov on February 6, 2012 for a psychiatric evaluation. (R. 267-270.)  In sum, Dr. Bougakov found that plaintiff's psychiatric problems were not "significant enough to interfere with [her] ability to function on a daily basis."  (R. 269.)  Dr. Bougakov diagnosed plaintiff with depressive disorder NOS, and polysubstance abuse in remission.  (*Id.*)  Plaintiff reported she was seeing a psychiatrist and taking Seroquel and Sertraline.  (R. 267.)  She also reported having difficulties with falling asleep, as well as experiencing increased appetite, low energy, loss of interest, dysphonic moods and diminished sense of pleasure.  (*Id.*)  Plaintiff did not complain of cognitive difficulties.  (*Id.*)  Dr. Bougakov observed that plaintiff was cooperative and related to him adequately during the evaluation.  (R. 268.)  Dr. Bougakov found that plaintiff's attention and concentration, and recent and remote memory skills were "mildly" impaired.  (*Id.*)  Plaintiff's cognitive functioning was in the average range and her "general fund of information [was] somewhat limited."  (*Id.*)  In addition, Dr. Bougakov found that plaintiff's insight and judgment were "fair."  (*Id.*)

During her visit with Dr. Bougakov, plaintiff indicated that she was "able to do all [her] chores by herself." (R. 269.) For example, she could "use a cellphone, manage [her] money, and take public transportation." (*Id.*) Dr. Bougakov determined that plaintiff could "understand simple directions and instructions." (*Id.*) She could "perform simple tasks, maintain attention and concentration, and maintain a regular schedule." (*Id.*) Dr. Bougakov noted that plaintiff was "somewhat limited in her ability to learn new tasks and perform complex tasks." (*Id.*) However, he found that plaintiff could nonetheless "make appropriate decisions, relate adequately with others, and deal with stress." (*Id.*)

Dr. Reddy, a psychologist, completed a psychiatric review for plaintiff by reviewing her medical records. (R. 271-88.) Dr. Reddy assessed depressive disorder NOS, polysubstance abuse, in remission and concluded that plaintiff had "the ability to perform at least simple work." (R. 279, 287.) Rating plaintiff's functional limitations under "B" Criteria of Listings 12.04 and 12.09, Dr. Reddy found that plaintiff had "mild" limitations "in maintaining social functioning," and "moderate" limitations in "maintaining concentration, persistence or pace." (R. 281.) Further, Dr. Reddy determined that plaintiff had not experienced repeated episodes of deterioration, each of extended duration. (*Id.*) Further, Dr. Reddy did not find any evidence of paragraph "C" criteria of listings in plaintiff's medical record. (R. 282.)

Evaluating plaintiff's Mental Residual Functioning Capacity according to Listings 12.04 and 12.09, Dr. Reddy found no significant limitation to plaintiff's ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) maintain attention and concentration for extended periods; (5) maintain attention and concentration for extended periods; (6) perform activities within a schedule, maintain regular attendance, and be punctual

customary tolerances; (7) sustain an ordinary routine without special supervision; (8) work in

coordination with or proximity to others without being distracted by them; (9) make simple

work-related decisions; (10) interact appropriately with the general public; (11) ask simple

questions or request assistance; (12) accept instructions and respond appropriately to criticism

from supervisors; (13) get along with coworkers or peers without distracting them or exhibiting

behavioral extremes; (14) maintain socially appropriate behavior and to adhere to basic standards

of neatness and cleanliness; (15) respond appropriately to changes in the work setting; (16) be

aware of normal hazards and take appropriate precautions; (17) travel to unfamiliar places or use

public transportation; and (18) set realistic goals or make plans independently of others. (R.285–

86) Under the same assessment criteria, Dr. Reddy found that plaintiff was "moderately" limited

in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed

instructions; and (3) complete a normal workday and workweek without interruptions from

psychological symptoms and to perform at a consistent pace without an unreasonable number

and length of rest periods.  (*Id.*)  To support his findings, Dr. Reddy provided that "[plaintiff] is

able to bathe, and groom independently, do all the chores by herself, use a cell phone, manage

money and use public transportation. . . . [s]he can maintain attention and concentration, make

appropriate decisions, relate to others and deal with stress."  (R. 287.)

Dr. Bebsy Estefan was the intake psychiatrist for plaintiff on her November 9,

2012 visit to Boston Road Medical Center.  (R. 383-86.)  Plaintiff was referred to Dr. Estafan by

Dr. Calderon.  (R. 383)  During her evaluation, plaintiff stated that she had been in treatment for

mental illness since she was a teenager, that she was "feeling depressed and eating a lot," had

"poor energy," and was not sleeping well.  (R. 383.)  She also complained of a decrease in her

libido.  (*Id.*)  She denied experiencing manic or psychotic symptoms, and said she had a

boyfriend for the past few months.  (*Id.*)

   Dr. Estefan described plaintiff as "friendly, attentive, fully communicative,

overweight, and relaxed."  (R. 384.)  Her mood was "entirely normal with no signs of depression

or mood elevation."  (*Id.*)  Her cognitive functions were "intact and age appropriate." (*Id.*)  In

addition, she was "fully oriented," and her "social judgment [was] intact."  (*Id.*)  She displayed

no signs of "hyperactive or attentional difficulties."  (*Id.*)  Dr. Estefan diagnosed plaintiff with

bipolar and anxiety disorder NOS, and listed her "feelings of responsibility to [her] children,

family or other loved entities, strong social support system, [and] history of ability to cope with

stress" as protective factors.  (R. 385.)  In addition, Dr. Estefan noted that plaintiff was

"cooperative and willing to accept help."  (*Id.*)  Dr. Estefan recommended plaintiff therapeutic

alliance and supportive psychotherapy, and education on the following: mental illness, side

effects of medication, Zoloft, and treatment compliance with medication and psychotherapy.

(R. 385)

   Plaintiff saw Angela Diaz on December 13, 2012 to get her medication refilled.

(R. 350-51.)  Dr. Diaz indicated that plaintiff had "good general state of health . . . no weakness,

no fatigue, no fever, good exercise tolerance" and was "able to do usual activities."  (R. 350.)

Dr. Diaz indicated that plaintiff's had a history of bipolar disorder and asthma.  (*Id.*)  Plaintiff

was described as "well-appearing, well-developed."  (*Id.*)  Plaintiff did not display signs of

"acute distress."  (*Id.*)  Her mood and affect were normal, she was alert and oriented to "person,

place and time."  (R. 351.)  Dr. Diaz diagnosed plaintiff with asthma, not otherwise specified,

and bronchitis NOS. (*Id.*)

III.     APPLICABLE LAW

A.  *Standard of Review*

      Under Rule 12(c), Fed.R.Civ.P., a movant is entitled to judgment on the pleadings only if the movant establishes that, based on the pleadings, she is entitled to judgment as a matter of law. *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possibly merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crofters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

      Review of the Commissioner's final decision denying disability benefits is limited.  The court may not review the Commissioner's decision *de novo*. *See Cage v. Comm'r of Soc. Servs.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted); *see also Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam). If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied ... the court shall review only the question of conformity with [the] regulations. . . .").

      Thus, a court's review involves two levels of inquiry. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  First, the court must review whether the Commissioner applied the correct legal standard.  *Tejada v. Apfel*, 167 F.3d 773; see *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).   Second, the court must decide whether the Commissioner's decision is supported by substantial evidence. *Tejada*, 167 F.3d at 773.

Substantial evidence means "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and quotation marks omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.  The substantial evidence test applies to inferences drawn from basic evidentiary facts, as a reviewing court "is required to examine the entire record, including . . . evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

The reviewing court views the evidence as a whole rather than considering evidence in isolation.  *See Talavera*, 697 F.3d at 151 (stating that the reviewing court is required to examine the entire record); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  Even if there is substantial evidence weighing against the Commissioner's position, the Commissioner's determination will not be disturbed so long as substantial evidence also supports it.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides).

It is the function of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including claimant.  *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  "[G]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted).  In particular, courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor

while testifying. *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).

Finally, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," regardless of whether the claimant is represented by counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights. *Robinson v. Sec'y of Health and Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984) (citation omitted).

B. *Five-Step Disability Determination*

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act provides that:

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

18

The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the SSA. 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has summarized this analysis as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citation and quotation marks omitted; brackets and omission in original).

The claimant bears the burden of proof for the first four steps.  *Shaw v. Charter*, 221 F.3d 126, 132 (2d Cir. 2000).  If the claimant meets his burden on the first four steps, then the burden shifts to the Commissioner at the fifth step to "show there is other gainful work in the national economy which the claimant could perform." *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).  Work that exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  At this fifth step, the Commissioner considers the claimant's residual functional capacity and vocational factors, such as age, education, and work experience, to see if he can make an adjustment to other work. 20 C.F.R. § 416.920.  To assist in this process, an ALJ uses Medical–Vocational Guidelines ("the Grids").  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2.  But, solely relying upon the

Grids is inadequate where the Medical–Vocational Guidelines do not particularly address plaintiff's limitations.  *See* 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e); *Zorilla v. Chater*, 915 F.Supp. 662, 667 (S.D.N.Y. 1996).

If a plaintiff has nonexertional impairments, the Commissioner must determine if they are significant.[2] "[W]hen a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations . . . the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) (emphasis added); *see also Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1998).

A nonexertional limitation significantly diminishes a plaintiff's ability to work when it causes "an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).  However, if the ALJ determines that plaintiff does not have limitations that significantly diminish their employment opportunities, "the ALJ may use Medical Vocational Guidelines (the Grid) to adjudicate the claim." *Woddmancy v. Colvin*, 577 F. App'x 72, 76 (2d Cir. 2014) (summary order.)

---

[2] Nonexertional impairments are "limitations or restrictions which affect [one's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling []. DI 25005.001 explains that if you can no longer do your past relevant work because of a severe medically determinable impairment(s), we must determine whether your impairment(s), when considered along with your age, education, and work experience, prevents you from doing any other work which exists in the national economy in order to decide whether you are disabled or continue to be disabled." Some examples of nonexertional impairments include difficulty in functioning due to anxiety, nervousness, depression, inability to concentrate or understand detailed instructions. 20 CFR 404.1569a, 416.969a; *see also* DI 24515.063 Exertional and Nonexertional Limitations

The Second Circuit has established that the "application of the grid guidelines and the necessity for expert testimony must be determined on a case-by case basis." *Bapp*, 802 F.2d at 605. More specifically,

> If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. . . . By the use of the phrase "significantly diminish" we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.

*Id.* at 605–06.

C. *Treating Physician Rule*

Under applicable regulations, the opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairment[s]" will be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess*, 537 F.3d at 128 (citations omitted). In contrast, a treating physician's opinion is not afforded controlling weight when the opinion is inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. 20 C.F.R. § 404.1527(d)(2); *Snell*, 177 F.3d at 133. In such a case, a report from a consultative physician may constitute substantial evidence. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). The Second Circuit has noted that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence." *Id.* If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so using the factors provided by the SSA. These factors, in brief, are: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment

21

relationship; (3) supportability; (4) consistency; (5) specialization; (6) any other factor which "tend to support or contradict the opinion." 20 C.F.R § 416.927(d)(2) (i)-(ii), (3)-(6). *See Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

If not afforded controlling weight, a treating physician's opinion is given weight according to a non-exhaustive list of enumerated factors, including: (1) the frequency of examinations and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the physician's opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the physician has a relevant specialty.  20 C.F.R §§ 404.1527(c) (2), 416.927(c)(2); *see also Clark*, 143 F.3d at 118.

Finally, the opinion of a treating physician, or any doctor, that the claimant is "disabled" or "unable to work" is not controlling.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).


IV.    DISCUSSION

This Court upholds ALJ Heyman's finding that plaintiff was not disabled. Contrary to plaintiff's assertion that the ALJ's decision was "erroneous, not supported by substantial evidence on the record and/ or contrary to the law" (Compl.¶ 9), this Court concludes that the ALJ applied the correct legal standard and his decision is supported by substantial evidence.


A.  *Application of the Five-Step Disability Determination*

Applying the sequential five-step process for evaluating disability claims, the ALJ found that plaintiff was not disabled under 1614(a)(3)(A) of the Social Security Act and denied her supplemental security income.  (R. 73.)

At step one, ALJ determined that plaintiff had not engaged in substantial gainful activity since December 30, 2011, the application date.  (R. 76.); *see* 20 C.F.R. §§ 416.971 *et seq*.  This is consistent with plaintiff's testimony stating that she never worked.  (R. 100, R. 212.)  At step two, the ALJ determined that plaintiff suffered from asthma, obesity and mood disorder, which constituted "severe impairments."  (R. 76.); 20 C.F.R. §§ 416.920(c) *et seq*.  Plaintiff's polysubstance abuse was not considered a "severe impairment" because evidence showed that plaintiff had not abused substances since her application on December 30, 2011.  (R. 76.)  Similarly, the Bell's palsy plaintiff developed on the left side of her face was not a "severe impairment" because plaintiff did not allege disability due to these claims and her mental status examinations remained normal despite the Bell's palsy.  (*Id.*)

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 78-79.)  Plaintiff's asthma did not meet the clinical criteria of Listing 3.03 because she did not have chronic asthmatic bronchitis, or asthma attacks occurring at least once every two months, or at least six months per year despite receiving treatment.  (*Id.*)  Similarly, plaintiff's obesity was not considered severe because it did not limit plaintiff's physical or mental abilities to do basic work activities, or present itself with another medically determinable physical or mental impairment, as required by SSR 02-01.  (*Id.*)  Further, the severity of plaintiff's mental impairment did not meet "paragraph B" criteria of Listings 12.04 (Affective Disorders) because her mental impairment did not result

23

in the minimum number of marked limitations or repeated episodes of decompensation, each of extended duration.  (R. 77.)  The ALJ applied the "special technique" required by the Commissioner's regulations when evaluating plaintiff's mental impairments.  (R. 77-78.)  20 C.F.R. §§ 404.1520a, 416.920a.  The ALJ concluded that "in activities of daily living, [plaintiff] has mild restrictions," and that "[i]n social functioning, [plaintiff] has mild difficulties."  (R. 77-78.)  He found that in "concentration, persistence or pace, [plaintiff] has moderate difficulties."  (R. 78.) Additionally, plaintiff had no history of decompensation.  Because plaintiff's mental impairment did not cause at least two marked limitations, or one marked limitation accompanied with repeated episodes of decompensation, the ALJ concluded that plaintiff did not satisfy the "paragraph B" criteria.  (*Id.*)  Thus, the ALJ concluded that the severity of plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.04.  (*Id.*)

At step four, the ALJ first found that plaintiff had "the residual functional capacity to perform less than the full range of medium work as defined in 20 C.F.R. § 416.967(c)."  (R. 79.) In doing so, the ALJ stated that plaintiff was "able to stand and/or walk for up to 6 hours and sit for up to 6 hours in an 8-hour workday, with normal breaks, [she] is [also] able to lift up to 50 pounds occasionally; and lift/or carry up to 25 pounds frequently."  (*Id.*)  He also stated that plaintiff would be limited to work "that involves simple, routine, and repetitive tasks."  (*Id.*)   Such finding is supported by substantial evidence. Specifically, the ALJ found that plaintiff "has the ability to understand, carry out and remember simple instructions."  (R. 85.)  The ALJ next determined that plaintiff had "no past relevant work."  (R. 84.)

Since plaintiff's claim survived the first four steps of the sequential inquiry, the burden then shifted to the Commissioner to show that plaintiff had the residual functional

capacity to perform jobs that exist in the national economy in significant numbers. *Draegert*, 311 F.3d at 427 (citation omitted.)  The ALJ found that the Commissioner had met that burden. Considering plaintiff's "age, education, work experience, and residual functional capacity," in conjunction with Medical Vocational Guidelines listed in 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grids"), the ALJ determined that plaintiff had the ability to: (1) understand, carry out, and remember simple instructions; (2) respond to supervision and coworkers without problems; and (3) deal with changes in routine work settings.  (R. 85.)  The ALJ therefore concluded that plaintiff could "meet the mental demands of unskilled work."  (*Id.*)  Further, the ALJ found that there were "jobs that exist in significant numbers in the national economy" that plaintiff could perform.  (R. 84.)  Accordingly, the ALJ properly applied the five-step process, made a determination of not disabled for plaintiff and denied her application.  (R. 85)

### B.  *Weight Afforded to Treating Physician's Opinion*

Plaintiff argues that the ALJ violated the "treating physician rule" of 20 C.F.R. § 404.1527 by failing to afford proper weight to the opinion of plaintiff's treating psychiatrist Dr. Grullon-Figueroa.  (Pl. Mem. 8–15.)  She asserts that the ALJ did not properly evaluate the evidence, and thus his decision "was not supported by the evidence." (Pl. Mem. 8.)

This Court concludes that the ALJ's decision not to give treating psychiatrist Dr. Grullon-Figueroa's opinion controlling weight is correct and supported by substantial evidence. (R. 83.)  The ALJ provided "good reasons" for deciding not to give the treating physician's opinion controlling or greatest weight, using the factors provided by the SSA in 20 C.F.R. § 416.927(d)(2) (i)-(ii), (3)-(6).

In reviewing Dr. Grullon-Figueroa's progress notes, the ALJ encountered internally inconsistent opinions issued within days of each other. (R. 83) Dr. Grullon-Figueroa filled out a Medical Source Statement during plaintiff's second visit, on January 15, 2015. (R. 298.) Dr. Grullon-Figueroa determined that plaintiff had four marked and two mild limitations in her ability "to understand, remember and carry out instructions." (*Id.*) She also noted plaintiff had "difficulty in concentrating." (*Id.*) She particularly emphasized plaintiff's "inability to interact appropriately with supervision, co-workers, and the public," noting that plaintiff had four marked limitations in this area. (R. 299.) This statement, given during her second visit with plaintiff, contradicts the rest of Dr. Grullon-Figueroa's progress notes, including the progress note she filled out the very next day. (R. 298-99, 379-80.) Dr. Grullon-Figueroa's progress notes from plaintiff's visit on January 16, 2013 indicate that "plaintiff [had] been stable with current management." (R. 379.) Dr. Grullon-Figueroa describes plaintiff's anxiety symptoms "as less frequent or less intense." (*Id.*) Plaintiff's mental status report from that day is in direct conflict with the statements made by Dr. Grullon-Figueroa the previous day in the Medical Source Statement, as during this visit Dr. Grullon-Figueroa reported that plaintiff had "no apparent serious mental status abnormalities." (*Id.*) Further, she noted that plaintiff did not seem to be experiencing "depression [or] mood elevation." (R. 379.) In contrast to her notes from the day before, which indicated "concentration difficulty associated with depression" and "memory problems," her notes from January 16, 2013 state that plaintiff had "no signs of cognitive difficulty," her "[m]emory [was] intact for recent and remote events and [she was] oriented to time, place and person. There [were] no apparent signs of anxiety. A normal attention span [was] in evidence and… [i]nsight and judgment appear intact." (R. 298-99, 399.)

The next nine progress reports from Dr. Grullon-Figueroa document similar findings.  Except for one progress report where plaintiff was reported to have "no apparent signs of anxiety," all other progress reports indicated plaintiff's cognitive functions were "intact."  (R. 355–87.)

Less than three weeks after filling out the Medical Source Report, Dr. Grullon-Figueroa wrote in her progress note on February 4, 2013 that plaintiff's behavior was "generally appropriate."  (R. 377.)  On June 11, 2013, Dr. Grullon-Figueroa described plaintiff's "affect as appropriate and full range."  (R. 369.)  She further indicated that plaintiff displayed no "bizarre behaviors" and her "social judgment appear[ed] fair."  (R. 365.)  A few weeks later, on June 27, 2013, Dr. Grullon-Figueroa noted that plaintiff's "memory [was] intact for recent and remote events."  (R. 362–63)  During her last visit with Dr. Grullon-Figueroa, plaintiff reported "feeling better" and that her "mood and anxiety symptoms [were] fairly stable."  (R. 360.)  Thus, in contrast to the eleven progress reports Dr. Grullon-Figueroa filled out over a span of a year, the Medical Source Statement is the only document where Dr. Grullon-Figueroa indicated that plaintiff had severe limitations.  Thus, the ALJ acted within his discretion by giving "little weight" to Dr. Grullon-Figueroa's January 15, 2012 Medical Source Statement, which was at odds with the rest of her progress reports.  (R. 83.)

The ALJ was also correct in giving Dr. Grullon-Figueroa's opinion less weight because the opinion is in conflict with findings of other physicians and plaintiff's testimony. Dr. Grullon-Figueroa's opinion is at odds with the opinions of Dr. Calderon, plaintiff's treating physician for more than two years, as well as three non-treating physicians, two of whom had the opportunity to meet with and observe plaintiff in person.

Plaintiff visited Dr. Calderon between September 14, 2010 and January 14, 2013. (R. 265, 290-96, 303-311, 325-353.)  During this period, plaintiff mentioned her psychological conditions only two times, on February 16, 2011 and March 12, 2012, to request refills on her psychiatric medications.  (R. 327, 331-33.)  On both of those occasions, plaintiff responded negatively to "feeling down depressed or hopeless" and "having little interest or pleasure in doing things."  (*Id.*)  In multiple reports Dr. Calderon described plaintiff as "[in] good general state of health," "well-appearing, well-developed, [displaying] no acute distress" and "able to do usual activities  (R. 323-27, 331–33, 335, 339.)  In her January 10, 2012 response to a New York Office of Temporary and Disability Assistance Division of Disability Determination questionnaire, Dr. Calderon stated that plaintiff's mental status was normal for every criteria except for "her attention and concentration abilities," which were a less than normal.  (R. 293.)  However, in direct contrast to Dr. Grullon-Figueroa's opinion, Dr. Calderon found that plaintiff "had no limitations with understanding and memory, sustained concentration, persistence, social interactions and adaptation."  (R. 295.)  Dr. Calderon specifically declined to comment on plaintiff's ability to do work-related activities.  (R. 296.)  However, there is nothing in Dr. Calderon's findings that support Dr. Grullon-Figueroa's assessment that plaintiff has "marked" limitations in her ability to "make judgments on simple work-related decisions," and "interact appropriately with the public, supervisors, co-workers and respond appropriately to usual work situations and to changes in a routine work setting."  (R. 298-99.)  Further, there is no support in Dr. Calderon's medical reports spanning over two years that plaintiff had "memory problems" caused by her "difficulty in concentrating," or "difficulty relating to others, irritability, [and] decreased sociability."  (*Id.*)  The ALJ properly decided to give "good weight" to Dr. Calderon's opinion because it is "consistent with the evidence."  20 C.F.R § 416.927 (c)(4).

Dr. Grullon-Figueroa's opinion also contradicted the opinion of Dr. Bebsy Estafan, a psychiatrist at Boston Medical Center, who completed plaintiff's Intake Evaluation on November 9, 2012.  (R. 384.)  Dr. Estafan commented that plaintiff was "friendly, attentive, fully communicative… and relaxed."  (*Id.*)  She found that plaintiff's cognitive functions, social judgment, language skills, associations, thinking, short and long term memory, orientation were all "intact."  (*Id.*)  She further noted that plaintiff was "cooperative and willing to accept help" and had a "history of ability to cope with stress."  (R. 384-85.)  There is nothing in Dr. Estafan's psychiatric evaluation that supports Dr. Grullon-Figueroa's conclusions.  Although the ALJ did not consider Dr. Estafan's opinion, her opinion nevertheless supports the ALJ's finding that Dr. Grullon-Figueroa's opinion is at odds with the medical evidence as a whole.  (R. 83-84.)

The opinion of Dr. Dmitri Bougakov, a psychologist at Industrial Medicine Associates, was given "good weight" by the ALJ, and is also at odds with Dr. Grullon-Figueroa's findings.  (R. 82.)  Although Dr. Bougakov agreed with Dr. Grullon-Figueroa's assessment that plaintiff had limitations to her recent and remote memory skills and concentration abilities, unlike Dr. Grullon-Figueroa, he found these limitations were "mild" and not "significant enough to interfere with [plaintiff's] ability to function on a daily basis."  (R. 269.)  Dr. Bougakov also found that plaintiff's insight, judgment, and ability to make appropriate decisions, relate adequately with others and deal with stress were "fair."  (R. 268-69.)  The ALJ gave good reasons for giving good weight to Dr. Bougakov's assessment, explaining that "the opinion is consistent with the doctor's findings made during his examination of [plaintiff]" as well as "with other evidence of record, such as [plaintiff's] ability to attend appointments as scheduled… and the results of the mental status examinations by [plaintiff's] primary care doctor and her psychiatrist, which were all essentially within normal limits."  (R. 82-83.)  Thus, even though Dr.

Bougakov and Dr. Grullon-Figueroa identified similar problems, Dr. Bougakov disagreed with the gravity of plaintiff's limitations.  To support his findings, Dr. Bougakov credited plaintiff's ability to "use a cellphone, manage [her] money, and take public transportation."  (R. 269.)  Dr. Bougakov's assessment that plaintiff was able to "understand simple directions and instructions," and that she could perform "simple tasks, maintain attention and concentration, and maintain a regular schedule" are consistent with the evidence, which show that plaintiff was able to maintain regular doctor's appointments, manage her medications, and use public transportation. (R. 83.)  Thus, the ALJ gave good reasons for giving good weight to Dr. Bougakov's opinion.

Similarly, Dr. Veddy's opinion, based on his review of plaintiff's record, is in conflict with Dr. Grullon-Figueroa's Medical Source Statement from January 15, 2013.  The ALJ gave "some weight" to Dr. Veddy's opinion even though he is a non-examining physician because there were "a number of other reasons to reach similar conclusions."  (R. 84)  Like Dr. Grullon-Figueroa, Dr. Veddy found that plaintiff had limitations in social functioning.  (R. 281, 298) However, unlike Dr. Grullon-Figueroa, Dr. Veddy thought plaintiff's limitations in social functioning were "mild," and not "marked."  (*Id.*)  In contrast to Dr. Grullon-Figueroa's finding that plaintiff had "marked" limitations in her ability to "interact appropriately with the public, supervisors, co-workers, and respond appropriately to usual work situations to usual work situations to changes in a routine work setting," Dr. Veddy stated that plaintiff could "make appropriate decisions, relate to others and deal with stress."  (R. 287.)  Further, Dr. Veddy agreed with Dr. Grullon-Figueroa's finding that plaintiff had moderate difficulties in "maintaining concentration, persistence or pace," however, like Dr. Bougakov, he disagreed with

Dr. Grullon-Figueroa's assessment of their severity, or that they caused to memory issues.[3]

Lastly, unlike Dr. Grullon-Figueroa, Dr. Veddy found that plaintiff had no significant limitations

in her ability to remember, understand and carry out simple instructions.  (R. 285, 298.)  In

support of his disagreement with Dr. Grullon-Figueroa's assessment, Dr. Veddy stated that

plaintiff had a "12th grade education," managed her daily activities independently, and that her

limitations would not prevent her from performing "at least simple work."  (R. 287.)

       Because Dr. Grullon-Figueroa's Medical Source Statement dated January 15,

2013 is inconsistent with her progress notes and is in conflict with the medical evidence as a

whole,  the ALJ acted properly in giving "little weight" to Dr. Grullon-Figueroa's opinion. (R.

83) *see* 20 C.F.R. § 404.1527(2)(d); *see also Snell*, 177 F.3d at 133.  The ALJ was within his

discretion to give non-treating physicians' reports "good weight," allowing them to constitute

"substantial evidence."  (R. 82.) *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d

Cir.1983).

    C.  *Vocational Expert Testimony*

       The ALJ was correct to apply "the Grids" to determine if plaintiff could perform a

job which exists in the national economy.  Although a plaintiff's nonexertional limitations may

render the use of the Grid inappropriate, this nonetheless does not preclude the ALJ from using

the Grid. *See Pratts*, 94 F.3d at 39.

       Plaintiff argues that the ALJ erred by failing to obtain vocational expert testimony

in light of plaintiff's nonexertional limitations.  To support this claim, plaintiff cites *Vargas*,

---

[3] Dr. Veddy found that plaintiff had no significant limitations in her ability to remember and understand detailed instructions, remember locations and work-like procedures, remember very short and simple instructions. (R. 285.) This is in direct contrast with Dr. Grullon-Figueroa's assertion that plaintiff's "difficulty concentrating is causing memory problems." (R. 298.)

stating "relying solely on the Grid is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  (Pl. Mem. 17) (citing *Vargas v. Astrue*, No. 10 Civ. 6306, 2011 WL 2946371 (S.D.N.Y. July 20, 2011).).

As discussed above, when the ALJ determines that plaintiff's nonexertional limitations do not "significantly diminish" their employment opportunities, "the ALJ may use Medical Vocational Guidelines (the Grid) to adjudicate the claim." *Woddmancy v. Colvin*, 577 F. App'x 72, 76 (2d Cir. 2014) (summary order.).

Here, the ALJ properly determined that plaintiff's nonexertional limitations do not significantly diminish plaintiff's employment opportunities in the national economy.  The ALJ found that plaintiff could meet the "mental demands of unskilled work" as specified in Social Security Ruling ("SSR") 85-15.[4]  (R. 85.)  This finding was supported by ALJ's assessment that plaintiff had the ability to "understand, carry out, and remember simple instructions."  (*Id.*)  Further, she could "respond to supervision and coworkers without problem and deal with changes in routine work settings."  (*Id.*)  This finding is also supported by plaintiff's own statements that she was able to attain her GED in four months, manage her bills, handle a saving account, use public transportation and manage her daily chores without assistance.  (R. 109, 125, 268-69.)

SSR 85-15 further states that "[w]here there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work" mainly because these jobs "ordinarily involve dealing

---

[4] SSR 85-15 states that "basic mental demands of competitive, remunerative work include the abilities on a sustained basis to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situation, and to deal with changes in a routine work setting." (R 84); SSR 85-15, 1985 WL 56857, at 4.

primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis." SSR 85-15, 1985 WL 56857, at *4.  Because the medical testimony and the ALJ's findings support the conclusion that plaintiff can meet the mental demands of unskilled work, and her limitations do not significantly diminish her employment opportunities, the ALJ properly determined that a significant number of jobs existed in the national economy without consulting a vocational expert. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  Further, the ALJ also considered plaintiff's exertional limitations and found that "SSR 85-15 supports a finding that a limitation against concentrated exposure to respiratory irritants is not a significant in terms of limiting the number of available [employment opportunities] because most job environments do not involve great amounts of dust, etc."  (R. 85.)  Thus, the ALJ properly decided not to consult a vocational expert.

V.      CONCLUSION

In summary, the ALJ properly applied the five-step disability determination analysis and the treating physician rule.  Further, the ALJ did not err by not consulting a vocational expert when determining whether there were jobs in the national economy that plaintiff could perform.  The ALJ's decision was legally correct and supported by substantial evidence in the record.  Thus, defendant's motion for judgment on the pleadings is granted, and the Commissioner's decision is affirmed.   The Clerk shall enter judgment for the defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 9, 2016